NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2020 VT 1

No. 2019-270

| | |
|---|---|
| In re C.L.S., Juvenile | Supreme Court |
| | On Appeal from<br>Superior Court, Chittenden Unit,<br>Family Division |
| | January Term, 2020 |

Thomas Carlson, J.

Sarah Star, Middlebury, for Appellant Mother.

Allison N. Fulcher of Martin & Delaney Law Group, Barre, for Appellant Father.

Thomas J. Donovan, Jr., Attorney General, Montpelier, and Jody A. Racht, Assistant Attorney General, Waterbury, for Appellee State.

Michael Rose, St. Albans, for Appellee Juvenile.

PRESENT: Reiber, C.J., Robinson, Eaton, Carroll and Cohen, JJ.

¶ 1. **CARROLL, J.** Parents appeal the termination of their parental rights to son C.L.S., who is nearly two years old. We affirm.

¶ 2. C.L.S. was born in February 2018. During mother's last trimester of pregnancy, hospital staff reported to the Department for Children and Families (DCF) that mother had repeatedly tested positive for illicit unprescribed substances. She missed numerous prenatal and medication-assisted-treatment appointments during her pregnancy. She declined inpatient treatment or a referral to a substance-abuse clinic.

¶ 3.    Parents are unmarried but lived together prior to C.L.S.'s birth.  In early February 2018, a DCF caseworker went to their home.  Father answered the door and reported that mother was inside sleeping.  He refused to wake mother up and would not let the caseworker into the home.  The DCF caseworker observed that father's eyes were "pinpoint."  DCF made several further unsuccessful attempts to meet with mother prior to C.L.S.'s birth.

¶ 4.    DCF has been involved with both parents in the past.  Mother has a history of substance abuse and mental health issues, and her parental rights to her first child were terminated in 2006.  Father was involved with DCF from 2010 to 2012 due to his ex-wife's substance abuse. He worked with DCF to retain custody of three of his children, all of whom are now adults.

¶ 5.    At birth, C.L.S. weighed less than five pounds, had an underdeveloped esophagus, and was in withdrawal from having illegal drugs in his system.  He initially required a feeding tube.  Mother also tested positive for numerous unprescribed illegal drugs.  DCF took C.L.S into custody on an emergency basis on the day he was born and filed a petition alleging that C.L.S. was a child in need of care or supervision (CHINS).

¶ 6.    A temporary care hearing began the following day.  The parents denied that C.L.S. was CHINS, sought a conditional order giving custody to father, and requested a contested temporary care hearing.  The court continued custody with DCF but permitted parents to have unsupervised contact with C.L.S. while he remained in the hospital.  C.L.S. was subsequently discharged to a foster home and father filed a motion requesting parent-child contact and unsupervised visitation.

¶ 7.    On March 15, the court began a contested temporary care hearing, which did not conclude due to lack of time.  A DCF caseworker testified that she had concerns regarding substance abuse by father.  These were based on her observation that he had pinpoint pupils when she visited parents' home and his refusal to undergo requested urinalysis.  The court ordered that

2

father could have unsupervised contact with C.L.S. for two hours each day, seven days a week, once he returned a clean urinalysis.

¶ 8. On May 24, the court resumed the temporary care hearing. At the beginning of the hearing, mother stipulated to the merits of the CHINS petition and the court entered an adjudication of CHINS. The court then heard testimony from two DCF employees relating to temporary care. At the conclusion of the hearing, the court stated that it did not find suspicions of father's drug use to be founded. However, it had some concerns about his living situation and needed more information from him before it could issue a conditional custody order. The court stated it would issue a final ruling on conditional custody to father once DCF completed a background check on father's roommate, conducted a home visit, and was satisfied there was a plan for C.L.S.'s care while father was sleeping and at work. It warned father that a substance-abuse assessment and urinalysis would be part of a conditional custody order and asked if father would be willing to submit to urinalysis prior to the court making a final decision. Father agreed to undergo urinalysis. He did not otherwise object to the court's ruling.

¶ 9. On May 29, the court resumed the temporary care hearing. The DCF caseworker represented to the court that father's roommate had a history of substance abuse and had voluntarily relinquished his own child in 2016. The caseworker had visited father's home and it appeared to be appropriate, although there were swords or machetes throughout the home that would need to be secured out of C.L.S.'s reach. She reported that father was on probation and was in substance-abuse counseling, but his attendance was sporadic. Earlier in May, father's urine had tested positive for marijuana, buprenorphine, and OxyContin. He had refused to undergo urinalysis requested by DCF after the last hearing.

¶ 10. The court stated that these facts undermined its previous finding that allegations of father's substance abuse were not founded. The court stated that it was "pretty astounding" that father refused to participate in urinalysis after being specifically warned at the previous hearing

that urinalysis would be a requirement of any conditional custody order. The court declined to issue a conditional custody order to father and continued DCF custody. It stated that father could seek reconsideration and an evidentiary hearing regarding DCF's representations. Father did not seek reconsideration or an evidentiary hearing. The court subsequently granted DCF's motion to suspend unsupervised visitation with father until he established a four-week period of abstinence.

¶ 11. In September 2018, after a contested disposition hearing, the court issued a disposition order continuing DCF custody and adopted a case plan calling for concurrent goals of reunification with either parent or adoption. Neither party appealed the disposition order. In January 2019, the State filed petitions to terminate mother's and father's parental rights.

¶ 12. The termination hearing took place in July 2019, following which the court issued a written order granting the petitions. The court found that parents' attendance at visits with C.L.S. was sporadic and they were frequently late. Each was asked to leave visits twice due to their behavior, mother for being loud and argumentative and father for suspected drug use. During one visit in October 2018, father was drooling, stumbling, and nearly incoherent. Neither parent engaged in substance-abuse treatment contemplated by the case plan. As of the summer of 2018, mother was smoking two packs of cigarettes a day, which concerned C.L.S.'s doctor due to the child's esophageal issue as well as the general dangers of secondhand smoke. After the State filed the termination petitions, parents were late for nearly every visit with C.L.S. even though they lived near the DCF office where visits occurred. Neither parent had provided requested urinalyses since January 2019, when father tested positive for benzodiazepine. The court did not find father's explanation for this positive result—that he had been prescribed Percocet for dental pain—to be credible, as there was no corroborating evidence.

¶ 13. The court found that parents had stagnated in their progress toward the case plan goals. It found that neither parent was likely to be able to assume parental duties within a reasonable time due to their lack of progress toward addressing their substance abuse issues,

4

mother's failure to address her mental health needs, and father's continued relationship with mother. The court concluded that termination of parental rights was in C.L.S.'s best interests and granted the petitions. Both parents appealed.

¶ 14. On appeal, neither parent challenges the court's findings or conclusions in the termination order. Rather, they assert that the court committed various errors at the temporary care hearings that require reversal of the merits determination and subsequent disposition orders. They argue that: the court lacked authority to require a suitability assessment of father as a prerequisite to placing C.L.S. with him because father was a custodial parent at birth; the court violated father's constitutional rights to due process and equal protection by treating him as a noncustodial parent and presuming him to be unfit merely because he was unmarried; and the court lacked subject-matter jurisdiction to make a finding of CHINS based on a stipulation by mother alone or on pre-birth circumstances, making the CHINS adjudication and subsequent disposition orders void.

¶ 15. For these reasons, parents ask this Court to vacate the CHINS, disposition, and termination orders even though they did not contest the procedures followed by the court or its jurisdiction until this appeal, a year and a half later. Because the alleged errors took place prior to the initial disposition order, which parents did not appeal, we hold that they are precluded from raising these arguments now.

¶ 16. A CHINS merits determination becomes final and subject to appeal once the court issues the resulting disposition order. See 33 V.S.A. § 5315(g) (providing that CHINS merits adjudication "is not a final order subject to appeal separate from the resulting disposition order"); 33 V.S.A. § 5318(d) (stating disposition order is final order). Parties are generally precluded from collaterally attacking a final CHINS merits determination at a later stage of the proceedings. See In re C.P., 2012 VT 100, ¶ 28, 193 Vt. 29, 71 A.3d 1142 (recognizing, under prior version of statute, that CHINS determination cannot be collaterally attacked by parent at termination stage).

5

Neither parent appealed the initial disposition order issued in September 2018. That order, and the associated CHINS merits determination, became final in October 2018.

¶ 17. Accordingly, parents "can prevail on their argument that the orders are void only if they satisfy the criteria for obtaining relief from a final judgment." In re B.C., 169 Vt. 1, 7, 726 A.2d 45, 50 (1999) (overruled on other grounds by In re C.P., 2012 VT 100, ¶ 24); see V.R.C.P. 60(b)(4) (stating court may relieve party from final judgment if judgment is void). In the context of a collateral attack, the fact that a judgment is erroneous does not automatically make it void. See, e.g., In re B.C., 169 Vt. at 8, 726 A.2d at 50. Rather, a judgment is void "only if the court that rendered it lacked jurisdiction of the subject matter, or of the parties, or if it acted in a manner inconsistent with due process of law." 11 C. Wright & A. Miller, Federal Practice & Procedure § 2862 (3d ed. 2019); see also Coles v. Coles, 2013 VT 36, ¶ 6, 193 Vt. 605, 73 A.3d 681 (noting that federal case law interpreting Federal Rules of Civil Procedure is authoritative source for interpretation of identical provisions in Vermont rules).

¶ 18. Parents argue that the CHINS adjudication and subsequent disposition orders were void for lack of subject-matter jurisdiction because the court lacked authority to adjudicate C.L.S. CHINS based on mother's stipulation alone. They reason that the statute requires the custodial parents to agree to a stipulation, and father was a custodial parent because he and mother lived together when C.L.S. was born. See 33 V.S.A. §§ 5102(22)(B) (defining "party" to include custodial parent), 5315a(b) (providing court may approve stipulation to merits of CHINS petition if parties agree to terms). As explained below, the alleged error is insufficient to render the judgment void for lack of subject-matter jurisdiction.

¶ 19. "A challenge made on subject matter grounds must show that the court lacked jurisdiction over the general category of case." In re C.P., 2012 VT 100, ¶ 18. If the court has jurisdiction over the category of case, its erroneous exercise of that jurisdiction does not make the resulting judgment void. Id. Here, the family court plainly had jurisdiction over the category of

6

case. See 33 V.S.A. § 5103(a) (giving family division of superior court exclusive jurisdiction over CHINS proceedings). Moreover, the family court was explicitly authorized to approve a written stipulation to the merits of the petition. Id. § 5315a. Thus, even if the court improperly adjudicated C.L.S. CHINS based on mother's stipulation alone, the judgment is not void for lack of subject-matter jurisdiction.

¶ 20. For the same reason, parents' argument that the CHINS adjudication was not supported by sufficient evidence because it was based on pre-birth circumstances is insufficient to render the judgment void.[*] "The fact that the court may have erred in how it exercised its jurisdiction neither voids the court's judgment nor precludes the parties from accepting the judgment or waiving the right to later challenge that judgment." In re D.C., 2012 VT 108, ¶ 15, 193 Vt. 101, 71 A.3d 1191 (rejecting argument that court lacked subject-matter jurisdiction to treat termination petition filed after initial disposition as if it were initial disposition).

¶ 21. The cases cited by parents are distinguishable because they involved direct appeals from allegedly invalid actions by the lower court. See, e.g., In re J.S., 153 Vt. 365, 370, 571 A.2d 658, 661 (1989) (holding juvenile court lacked authority to order child protection agency to comply with federal Adoption Assistance Act provision requiring periodic administrative reviews in context of protective-order hearing); In re T.L.S., 139 Vt. 197, 199, 425 A.2d 96, 97 (1980) (holding juvenile court lacked authority to order psychiatric examination of mother, and reversing because without results of examination there was insufficient evidence to support finding of CHINS). There was no question in these cases that the juvenile court had subject-matter

---

[*] Parents argue that the CHINS petition cannot be based on mother's conduct toward her body prior to C.L.S.'s birth because C.L.S. was not then a "child" within the meaning of 33 V.S.A. § 5102(2). Although they attempt to frame this as a jurisdictional argument, in the context of this case it is really a challenge to the sufficiency of the evidence supporting the CHINS adjudication. The CHINS petition was filed after C.L.S. was born, so there is no question that the court had subject-matter jurisdiction over the case. We note, however, that even "[c]ommencement of a CHINS proceeding prior to a child's birth does not necessarily deprive the family court of subject matter jurisdiction." In re N.H., 2005 VT 118, ¶ 6, 179 Vt. 537, 889 A.2d 727 (mem.).

7

jurisdiction over the type of action before it. Rather, the question posed in each case was whether a particular procedure followed by the court was authorized by statute. Because the parties in those cases timely challenged the court's actions in direct appeals, the alleged errors could be grounds for reversal.

¶ 22. The grounds for overturning a final judgment outside of a direct appeal are much narrower, however. "In the context of Rule 60(b)(4), a lack of subject-matter jurisdiction for the purpose of making a judgment void means a court's lack of jurisdiction over an entire category of cases, not whether a court makes a proper or improper determination of subject-matter jurisdiction in a particular case." In re B.C., 169 Vt. at 7, 726 A.2d at 50 (quoting 12 J. Moore et al., Moore's Federal Practice § 60.44(2)(a), at 60-142 (3d ed. 1998)). "Thus, when a court has jurisdiction over a general category of case, the fact that the court errs in exercising its jurisdiction in a particular case within that general category is generally not sufficient to make the resulting judgment void for lack of subject-matter jurisdiction." Id. (quotation omitted). As we recognized in In re B.C., "[t]here are important policy reasons for voiding judgments under Rule 60(b)(4) only in the narrowest of circumstances." Id. at 8, 726 A.2d at 50. Interpreting the rule narrowly promotes finality of judgments and forces parties to make their jurisdictional arguments in a timely manner, rather than contesting the merits "while reserving the 'jurisdictional card' in the event of an unfavorable decision." Id.

¶ 23. Thus, "[u]nless a court has usurped power not accorded to it, its exercise of subject-matter jurisdiction is binding in subsequent proceedings as long as the jurisdictional question was litigated and decided or the parties had an opportunity to contest subject-matter jurisdiction but failed to do so." Id. (emphasis added); see also Restatement (Second) of Judgments § 12 (1982) (explaining that, unless subject matter of action "was so plainly beyond the court's jurisdiction that its entertaining the action was a manifest abuse of authority," parties are precluded from challenging final judgment for lack of subject-matter jurisdiction). This is so even if a party's

argument would have succeeded on direct appeal. See Kocher v. Dow Chem. Co., 132 F.3d 1225, 1229 (8th Cir. 1997) ("[I]f a party fails to appeal an adverse judgment and then files a Rule 60(b)(4) motion after the time permitted for an ordinary appeal has expired, the motion will not succeed merely because the same argument would have succeeded on appeal."); Nemaizer v. Baker, 793 F.2d 58, 65 (2d Cir. 1986) ("[I]f the parties could have challenged the court's power to hear a case, then res judicata principles serve to bar them from later challenging it collaterally."). In the case before us, parents had the opportunity to challenge the allegedly erroneous exercise of subject-matter jurisdiction by appealing the CHINS determination after initial disposition. They failed to do so, and therefore are precluded from raising the issue now.

¶ 24. Similarly, parents could have raised their arguments that the court improperly treated father as a noncustodial parent and presumed he was unfit because he was unmarried at the temporary care hearing or at initial disposition, when father's fitness as a caregiver was being addressed. Having failed to object in a timely fashion or to appeal the initial disposition order, parents are precluded from collaterally attacking the order on these grounds.

¶ 25. To the extent that parents are claiming the judgment is void because the court acted inconsistently with due process, the record does not support this claim. "[T]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Brock v. Roadway Express, Inc., 481 U.S. 252, 261 (1987) (quotation omitted). Father was provided notice of the CHINS petition and the temporary care hearings. He appeared with counsel at those hearings, including the May 24 hearing at which the court accepted mother's stipulation. Although he had the opportunity to do so, father did not object to the CHINS adjudication or argue that his signature was necessary as a custodial parent. Nor did he appeal when the court issued the initial disposition order. The record therefore does not reflect a deprivation of due process that would render the CHINS judgment void.

¶ 26. Parents suggest that because father was treated as a noncustodial parent and Vermont law allows the court to adjudicate a child to be in need of care or supervision based on the stipulation of the custodial parent alone, he would not have been considered a party with standing to appeal the merits adjudication. However, the statute makes clear that a noncustodial parent who enters an appearance in a CHINS proceeding is a party. 33 V.S.A. § 5102(22)(C). Father therefore had standing to appeal. Whether father was actually a custodial parent and whether his signature was necessary to a valid stipulation were issues that father could have raised on appeal from the initial disposition order.

¶ 27. Because parents do not otherwise challenge the court's findings and conclusions in its termination order, we affirm.

Affirmed.

FOR THE COURT:

_____

Associate Justice

10